## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-21935-CIV-LENARD/O'SULLIVAN

**HERENA SOUTO, and all**
**others similarly situated under**
**29 U.S.C. § 206(b),**

     Plaintiff,

**v.**

**FLORIDA INTERNATIONAL**
**UNIVERSITY FOUNDATION, INC.,**
**a Florida non-profit corporation,**
**CHRISTY MARTINEZ, individually,**
**and FLORIDA INTERNATIONAL**
**UNIVERSITY, a Florida public university,**

     Defendants.

_____/

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS (D.E. 36), DISMISSING THIRD AMENDED COMPLAINT WITHOUT PREJUDICE, AND CLOSING CASE

**THIS CAUSE** is before the Court on Defendants Florida International University Foundation Inc. ("the Foundation"), Christy Martinez ("Martinez"), and Florida International University's ("FIU") Motion to Dismiss, ("Motion," D.E. 36), filed January 13, 2020. Plaintiff Herena Souto filed a Response on January 27, 2020, ("Response," D.E. 37), to which Defendants filed a Reply on February 13, 2020, ("Reply," D.E. 40). Upon review of the Motion, Response, Reply, and the record, the Court finds as follows.

I.      **Background**[1]

From March 16, 2016 through May 21, 2018, Plaintiff worked for the Foundation as Coordinator of Foundation Board Relations.  (Third Am. Compl. ¶ 16.)  Martinez was Plaintiff's supervisor.  (Id. ¶ 26.)  During her employment at the Foundation, Plaintiff worked 690 hours of uncompensated overtime.  (Id. ¶¶ 17-20.)

On June 29, 2017, Plaintiff was diagnosed with breast cancer.  (Id. ¶ 27.)  On July 20, 2017, Plaintiff requested FMLA leave to undergo surgery and other treatment.  (Id. ¶ 29.)  This leave was validated by her doctor and authorized and approved by the Foundation.  (Id. ¶ 30.)  Martinez assigned Plaintiff an unreasonable list of tasks to complete before her leave began.  (Id. ¶ 31.)  Plaintiff was on FMLA leave from August 1, 2017 through September 25, 2017.  (Id. ¶ 33.)

Plaintiff returned to work on September 27, 2017.  (Id. ¶ 36.)  Upon her return, the Foundation approved a flexible schedule under the FMLA of twenty-five hours per week until November 30, 2017 to accommodate Plaintiff's medical restrictions.  (Id. ¶ 37.)  Due to some medical complications and the side effects of radiation treatment, Plaintiff required an extension of her FMLA flexible schedule to December 14, 2017, which the Foundation approved.  (Id. ¶ 41.)  However, due to further complications that necessitated Plaintiff continue working a reduced schedule, the Foundation requested that Plaintiff file for intermittent leave under the FMLA.  (Id.)  On December 13, 2017, the Foundation approved Plaintiff's intermittent leave through June 30, 2018.  (Id.)

---

[1]      Unless otherwise indicated, the following facts are gleaned from Plaintiff's Third Amended Complaint.  (D.E. 34.)

Plaintiff alleges that while she was on a flexible schedule, Martinez "continuously unlawfully harassed and interfered with [Plaintiff's] valid and authorized FMLA [leave] and discriminated and retaliated against Souto for taking such leave, by among other things, failing to accommodate her medical restrictions." (Id. ¶ 37; see also id. ¶ 40.) She further alleges that while she was on intermittent leave, "Martinez continued to discriminate and interfere with Souto's FMLA rights[,]" (id.¶ 41); for example, in January 2018, Martinez asked Plaintiff to ask her physicians to remove the medical restrictions and obtain clearance to work additional hours in order to meet the needs of upcoming events, (id. ¶ 43). Plaintiff complained about this to Human Resources. (Id.)

On February 7, 2018, Martinez placed Plaintiff on a Performance Action Plan for her failure to meet the requirements of her position. (Id. ¶ 44.)

On May 21, 2018, while still on FMLA leave, Martinez terminated Plaintiff from her employment at the Foundation. (Id. ¶ 45.)

On May 14, 2019, Plaintiff filed a Complaint against FIU alleging violations of the FMLA, 29 U.S.C. § 2601 et seq., and Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq. (D.E. 1.) The case was originally assigned to Judge Cooke. (See D.E. 2.)

On May 16, 2019, Plaintiff filed an Amended Complaint against FIU. (D.E. 5.) After FIU filed a Motion to Dismiss, (D.E. 13), Plaintiff moved for leave to file a Second Amended Complaint, (D.E. 16), which Judge Cooke granted, (D.E. 17).

On June 26, 2019, Plaintiff filed her Second Amended Complaint against the Foundation and Martinez. (D.E. 8.) Judge Cooke subsequently recused, and the case was reassigned to the undersigned Judge. (D.E. 22.) On December 19, 2019, the Foundation

3

and Martinez filed a Motion to Dismiss the Second Amended Complaint.  (D.E. 31.)  On December 27, 2019, Plaintiff moved for leave to file a Third Amended Complaint, (D.E. 32), which the Court granted, (D.E. 33).

On December 30, 2019, Plaintiff filed the operative Third Amended Complaint against the Foundation, Martinez, and FIU alleging the following causes of action:

- <u>Count I</u>: Interference under the FMLA against the Foundation, (D.E. 34 ¶¶ 53-59);

- <u>Count II</u>: Interference under the FMLA against Martinez, (<u>id.</u> ¶¶ 60-66);

- <u>Count III</u>: Discrimination/retaliation in violation of the FMLA against the Foundation, (<u>id.</u> ¶¶ 67-73);

- <u>Count IV</u>: Discrimination/retaliation in violation of the FMLA against Martinez, (<u>id.</u> ¶¶ 74-80);

- <u>Count V</u>: Violations of the FLSA overtime provisions against the Foundation, (<u>id.</u> ¶¶ 81-94);

- <u>Count VI</u>: Violations of the FLSA overtime provisions against Martinez, (<u>id.</u> ¶¶ 95-106);

- <u>Count VII</u>: Discrimination under the Americans with Disabilities Act ("ADA") against the Foundation, (<u>id.</u> ¶¶ 107-112); and

- <u>Count VIII</u>: Discrimination under the ADA against FIU, (<u>id.</u> ¶¶ 113-19).

On January 13, 2020, Defendants filed the instant Motion to Dismiss the Third Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (D.E. 36.)

## II.    Legal Standards

### a.    Rule 12(b)(1)

Under Rule 12(b)(1), a party may move to dismiss a complaint for lack of subject

matter jurisdiction.   "If the court determines at any time that it lacks subject-matter

jurisdiction, the court must dismiss the action."  Fed. R. Civ. P. 12(h)(3).

> Attacks on subject matter jurisdiction come in two forms: (1) facial attacks,
> and (2) factual attacks.  Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir.
> 1990) (citing Menchaca v. Chrysler Credit Corp., 613 F.2d 507, 511 (5th Cir.
> 1980)).

> Facial attacks on a complaint "require the court merely to look and see if the
> plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the
> allegations in [plaintiff's] complaint are taken as true for the purposes of the
> motion."  Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990).
> Factual attacks challenge "the existence of subject matter jurisdiction in fact,
> irrespective of the pleadings, and matters outside the pleadings, such as
> testimony and affidavits, are considered."  Lawrence, 919 F.2d at 1529.  This
> circuit has explained that in a factual attack, the presumption of truthfulness
> afforded a plaintiff under Federal Rule of Civil Procedure 12(b)(6) does not
> attach, and the court is free to weigh the evidence, stating:

>> [in a factual attack upon subject matter jurisdiction] the trial court may
>> proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56.
>> Because at issue in a factual 12(b)(1) motion is the trial court's
>> jurisdiction—it's very power to hear the case—there is substantial
>> authority that the trial court is free to weigh the evidence and satisfy
>> itself as to the existence of its power to hear the case.  In short, no
>> presumptive truthfulness attaches to plaintiff's allegations, and the
>> existence of disputed material facts will not preclude the trial court
>> from evaluating for itself the merits of jurisdictional claims.

> Lawrence, 919 F.2d at 1529 (quoting Williamson v. Tucker, 645 F.2d 404,
> 412–13 (5th Cir. 1981)).

Scarfo v. Ginsberg, 175 F.3d 957, 960-61 (11th Cir. 1999).

### b.       Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a claim for "failure to state a claim upon which relief can be granted." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Conclusory statements, assertions or labels will not survive a 12(b)(6) motion to dismiss. Id. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.; see also Edwards v. Prime, Inc., 602 F.3d 1276, 1291 (11th Cir. 2010) (setting forth the plausibility standard). "Factual allegations must be enough to raise a right to relief above the speculative level[.]" Twombly, 550 U.S. at 555 (citation omitted). Additionally:

> Although it must accept well-pled facts as true, the court is not required to accept a plaintiff's legal conclusions. Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (noting "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"). In evaluating the sufficiency of a plaintiff's pleadings, we make reasonable inferences in Plaintiff's favor, "but we are not required to draw plaintiff's inference." Aldana v. Del Monte Fresh Produce, N.A., Inc., 416 F.3d 1242, 1248 (11th Cir. 2005). Similarly, "unwarranted deductions of fact" in a complaint are not admitted as true for the purpose of testing the sufficiency of plaintiff's allegations. Id.; see also Iqbal, 129 S. Ct. at 1951 (stating conclusory allegations are "not entitled to be assumed true").

Sinaltrainal v. Coca-Cola, 578 F.3d 1252, 1260 (11th Cir. 2009), abrogated on other grounds by Mohamad v. Palestinian Auth., 566 U.S. 449, 132 S. Ct. 1702, 1706 n.2 (2012). The Eleventh Circuit has endorsed "a 'two-pronged approach' in applying these principles:

1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting Iqbal, 556 U.S. at 679).

## III.    Discussion

Defendants argue that the FMLA and FLSA claims against the Foundation (Counts I, III, and V) are barred by Eleventh Amendment immunity, (Mot. at 10-13); Martinez is a public official not subject to individual liability under the FMLA or FLSA (Counts II, IV, and VI), (id. at 13-14); Plaintiff has failed to allege a prima facie case of discrimination under the ADA (Counts VII and VIII), (id. at 15-17); Plaintiff's claim for monetary damages under the ADA is barred by the Eleventh Amendment (Counts VII and VIII), (id. at 17-18); and Plaintiff has failed to state a cause of action against FIU, and in any event, FIU is not amenable to suit (Count VIII), (id. at 18-19).

### a.    Counts I, III, and V

First, Defendants argue that the FMLA and FLSA claims against the Foundation (Counts I, III, and V) are barred by Eleventh Amendment immunity.  (Mot. at 10-13.)  "A motion to dismiss asserting the defense of Eleventh Amendment immunity presents a challenge to the court's subject matter jurisdiction." Baker, 2016 WL 7385811, at *1.  See also Thomas v. U.S. Postal Serv., 346 F. App'x 600, 601 (11th Cir. 2010) ("[A] dismissal on sovereign immunity grounds should be pursuant to Rule 12(b)(1) because no subject-matter jurisdiction exists.") (citing Bennett v. United States, 102 F.3d 486, 488 n.1 (11th

Cir. 1996)); Harris v. Bd. of Trs. Univ. Ala., 846 F. Supp. 2d 1223, 1231 (N.D. Ala. 2012). As such, it is properly analyzed under Rule 12(b)(1).  See id.

Defendants argue that FIU, as a state university, is an arm of the state entitled to Eleventh Amendment immunity, and pursuant to Section 1004.28, Florida Statutes and FIU Regulation 1502, the Foundation is a Direct Support Organization ("DSO") of FIU. (Id. at 9-10.)  They argue that, as a matter of law, DSOs are arms of the state entitled to Eleventh Amendment immunity.  (Id. at 10 (citing Baker v. Univ. Med. Serv. Assoc., Inc., CASE NO: 8:16–CV–2978–T–30MAP, 2016 WL 7385811, at *3 (M.D. Fla. Dec. 21, 2016); Univ. of Fla. Research Found., Inc. v. Medtronic PLC, CASE NO. 1:16CV183-MW/GRJ, 2016 WL 3869877, at *2-4 (N.D. Fla. July 15, 2016); Elend v. Sun Dome, Inc., CASE No. 8:03–CV–1657–T–TGW, 2005 WL 8145752, at *4-5 (M.D. Fla. Dec. 22, 2005); Plancher v. UCF Athletics, Ass'n, Inc., 175 So. 3d 724, 729 (Fla. 2015)).)  They argue that Congress did not abrogate Eleventh Amendment immunity for claims arising under the FMLA and FLSA.  (Id. at 10-13 (citing, e.g., Coleman v. Court of Appeals of Maryland, 566 U.S. 30, 37-39 (2012); Garrett v. Univ. of Ala. at Birmingham Bd. of Trs., 193 F.3d 1214, 1219-20 (11th Cir. 1999); Keeler v. Fla. Dep't of Health, Div. of Disability Determinations, 397 F. App'x 579, 582 (11th Cir. 2010); Powell v. Florida, 132 F.3d 677, 678 (11th Cir. 1998)).)

In her Response, Plaintiff argues that the Foundation is not an arm of the state and is not entitled to Eleventh Amendment immunity.  (Resp. at 3.)  She argues that the Foundation does not meet Florida's statutory definition of a DSO, (id. at 3-5); FIU lacks authority and control over the Foundation, (id. at 5-7); the Foundation receives all of its

8

funding solely from the private sector and not from the State of Florida, (id. at 7); and the Foundation is liable for judgments against it, (id. at 7-8).

In their Reply, Defendants initially note that Plaintiff failed to cite a single case in which a designated university DSO, like the Foundation, has been deemed not to be an arm of the state.  (Reply at 2.)  They further argue that Plaintiff failed to rebut their argument that FIU Regulation 1502 establishes that the Foundation is an arm of the state under the factors utilized by the Eleventh Circuit and Florida Supreme Court.  (Id. (citing Plancher, 175 So. 3d at 727 (citing Tuveson v. Fla. Governor's Council on Indian Affairs, Inc., 734 F.2d 730, 732 (11th Cir. 1984))).)

The Eleventh Amendment to the United States Constitution[2] establishes "that each State is a sovereign entity in our federal system" and is not "'amenable to the suit of an individual without its consent[.]'''"  Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54 (1996) (quoting Hans v. Louisiana, 134 U.S. 1, 13 (1890) (quoting The Federalist No. 81, p. 487 (C. Roositer ed. 1961) (A. Hamilton))).  The exception to this rule is where "Congress has 'unequivocally expresse[d] its intent to abrogate the immunity'" pursuant to a "'valid exercise of power[.]'''"  Id. (quoting Green v. Mansour, 474 U.S. 64, 68 (1985)).  "Eleventh Amendment immunity 'extends not only to the state itself, but also to state

---

[2]     The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  "Although the text of the Amendment would appear to restrict only the Article III diversity jurisdiction of the federal courts," Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54 (1996), "[t]he Eleventh Amendment prohibits federal courts from exercising subject matter jurisdiction in suits brought against a state by a citizen of that state."  Schopler v. Bliss, 903 F.2d 1373, 1378 (11th Cir. 1990) (citing Welch v. State Dep't of Highways & Pub. Transp., 483 U.S. 468, 472 (1985); Hans v. Louisiana, 134 U.S. 1, 13 (1890)).

officers and entities when they act as an 'arm of the state.'" Lightfoot v. Henry Cty. Sch. Dist., 771 F.3d 764, 768 (11th Cir. 2014) (quoting United States ex rel. Lesinski v. S. Fla. Water Mgmt. Dist., 739 F.3d 598, 601 (11th Cir. 2014)). "Whether an entity constitutes an arm of the state under Eleventh Amendment analysis is a question of law." Baker, 2016 WL 7385811, at *2 (citing Lesinski, 739 F.3d at 602).

"It is well settled in Florida that state universities, and their boards of trustees, are arms of the state that are entitled to Eleventh Amendment immunity." Id. (citing Crisman v. Fla. Atl. Univ. Bd. of Trs., 572 F. App'x 946 (11th Cir. 2014); Irwin v. Miami-Dade Cty. Pub. Schs., et al., 398 F. App'x 503, 507 (11th Cir. 2010)); see also Maynard v. Bd. of Regents of the Div. of Univs. of the Fla. Dep't of Educ. ex rel. Univ. of S. Fla., 342 F.3d 1281, 1288 (11th Cir. 2003); Paylan v. Teitelbaum, Case No. 1:15–cv–159–MW–GRJ, 2017 WL 2294084, at *2 (N.D. Fla. May 23, 2017) (citing Crisman, 572 F. App'x 946; Jefferson v. Fla. State Univ. Bd. of Trs., No. 4:11cv151–RS/CAS, 2012 WL 1802152 (N.D. Fla. Apr. 12, 2012); Saavedra v. USF Bd. of Trs., No. 8:10–CV–1935–T–17TGW, 2011 WL 1742018, at *2-3 (M.D. Fla. May 6, 2011); Elend v. Sun Dome, Inc., CASE No. 8:03–CV–1657–T–TGW, 2005 WL 8145752, at *3-7 (M.D. Fla. Dec. 22, 2005)); Schultz v. Bd. of Trs. of Univ. of W. Fla., No. 3:06cv442-RS-MD, 2007 WL 1490714 (N.D. Fla. May 21, 2007)).

Defendants argue that the Foundation is a DSO of FIU and, as such, it is an arm of the state for purposes of Eleventh Amendment immunity. (Mot. at 9-10 (citing Baker, 2016 WL 7385811, at *3-4 (finding that the University Medical Service Association was a DSO of the University of South Florida and entitled to Eleventh Amendment immunity);

Medtronic PLC, 2016 WL 3869877, at \*2-4 (finding that the University of Florida Research Foundation was a DSO of the University of Florida and entitled to Eleventh Amendment immunity);[3] Elend, 2005 WL 8145752, at \*4-5 (finding that the Sun Dome was a DSO of the University of South Florida and entitled to Eleventh Amendment immunity); Plancher, 175 So. 3d at 729 (finding that the University of Central Florida Athletics Association was a DSO of the University of Central Florida and entitled to limited sovereign immunity under Section 768.28(5), Florida Statutes).

Plaintiff does not dispute that the relevant case law uniformly holds that DSOs are arms of the state for Eleventh Amendment immunity purposes; rather, she argues that the Foundation does not meet the statutory definition of a DSO and does not meet the criteria for being an "arm of the state." (Resp. at 3-8.)

"In determining 'whether [an] entity . . . is an arm of the state,' the circumstances 'must be assessed in light of the particular function in which the [entity] was engaged when taking the actions out of which liability is asserted to arise.'" Medtronic PLC, 2016 WL 3869877, at \*2 (quoting Abusaid v. Hillsborough Cty. Bd. of Cty. Comm'rs, 405 F.3d 1298, 1303 (11th Cir. 2005) (quoting Manders v. Lee, 338 F.3d 1304, 1308 (11th Cir. 2003))). Here, the alleged FMLA and FLSA violations occurred between 2016 and 2018. (See Third Am. Compl. ¶¶ 16, 19-20, 26-45.) During that time, the Foundation's function, as expressly stated in its Articles of Incorporation, was "to assist Florida International

---

[3]    Although the Medtronic court did not specifically refer to the University of Florida Research Foundation as a DSO, it recognized that it was organized under the DSO statute, Fla. Stat. § 1004.28, for the benefit of the University of Florida. 2016 WL 3869877, at \*2.

University . . . in providing excellent educational opportunities for all of its students and in offering public service to the South Florida community," and specifically, to: (1) "[p]rovide support for the President of [FIU] on the goals, plans and activities of the University"; (2) "[p]romote knowledge and understanding in the South Florida community of the goals, plans, activities and impact of the University and to promote knowledge and understanding in the University community of the needs and opportunities of the South Florida community"; and (3) "[s]upport the educational, scientific, cultural and charitable activities of the University and related organizations by requesting, receiving, holding, investing, administering, granting and disbursing gifts of funds and property."  (D.E. 40-3 at 2.) Accordingly, it appears that the Foundation's main function was to operate as an arm of FIU.  See Baker, 2016 WL 7385811, at *2 (observing that it appeared that the University Medical Service Association's main function was to operate as an arm of the University of South Florida where USF's regulations expressly stated that the Association was to serve as the "University's agent for the orderly collection and administration of income generated from the University faculty practice").  "This does not end the inquiry, however."  Id.

"In determining whether the Eleventh Amendment provides immunity to a particular entity, this court examines the following factors: (1) how state law defines the entity; (2) what degree of control the state maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity."  Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n, 226 F.3d 1226, 1231 (11th Cir. 2000) (citing Tuveson, 734 F.2d at 732).

### 1.       How state law defines the Foundation

The Court initially observes that FIU Regulation 1502—which is titled "Direct Support Organizations"—explicitly identifies the Foundation as a DSO in paragraph 7(d)(i) & (ii).  (See D.E. 40-1 at 3.)  Under Florida law

> "University direct-support organization" means an organization which is:
>
> 1. A Florida corporation not for profit incorporated under the provisions of chapter 617 and approved by the Department of State.
>
> 2. Organized and operated exclusively to receive, hold, invest, and administer property and to make expenditures to or for the benefit of a state university in Florida or for the benefit of a research and development park or research and development authority affiliated with a state university and organized under part V of chapter 159.
>
> 3. An organization that a state university board of trustees, after review, has certified to be operating in a manner consistent with the goals of the university and in the best interest of the state. Any organization that is denied certification by the board of trustees shall not use the name of the university that it serves.

Fla. Stat. § 1004.28(1)(a).  Plaintiff argues that the Foundation does not meet the statutory definition of a DSO.  (Resp. at 3-5.)

The Court finds that the Foundation clearly meets the definition of a DSO.  The Foundation's Articles of Incorporation identify the Foundation as "a Florida Not For Profit Corporation"; state that the Articles "were adopted pursuant to Sections 617.1002 and 617.1007, Florida Statutes"; and indicate that the Foundation was organized to "[s]upport the educational, scientific, cultural and charitable activities of the University and related organizations by requesting, receiving, holding, investing, administering, granting and disbursing gifts of funds and property."  (D.E. 40-3 at 2.)  Moreover, the Foundation's

Financial Statement reflects that the Foundation "is certified as a direct support organization . . . ."  (D.E. 40-4 at 6.)  Finally, the Foundation uses FIU's name, which further establishes that it is certified by the Board of Trustees.  <u>See</u> Fla. Stat. § 1004.28(1)(a)(3).  Thus, by definition, the Foundation is a DSO, and this factor suggests that the Foundation is an arm of the state.  <u>Baker</u>, 2016 WL 7385811, at *3 (finding that because the University Medical Service Association was a DSO of the University of South Florida, "this factor demonstrates that Florida law defines Defendant as an arm of the state"); <u>Medtronic PLC</u>, 2016 WL 3869877, at *2 (finding that the University of Florida Research Foundation was a certified DSO controlled by the state); <u>Eland</u>, 2005 WL 8145752, at *5 (finding that the Sun Dome was a DSO because, inter alia, it was established as a not-for-profit corporation by the University of South Florida, and the contract between the parties indicated that the Sun Dome was organized to operate for and on behalf of the university, and to engage in activities which exclusively support and benefit the University, the Board of Regents of the State of Florida, and the State of Florida); <u>Plancher</u>, 175 So. 3d at 726 (finding that the UCF Athletics Association was a DSO "primarily acting as an instrumentality of the state").

### 2.    Degree of control the state maintains over the Foundation

Next, the record evidence clearly establishes that the state, through FIU, its board of trustees ("FIU BOT"), and the Florida Board of Regents, exercises a significant amount of control over the Foundation.  For example, FIU BOT promulgated Regulation 1502 to govern all FIU DSOs and establishes the requirements that a DSO must fulfil in order to be certified by the FIU BOT as a DSO.  (<u>See</u> D.E. 40-1.)  The Regulation provides, inter

alia, that any amendments to a DSO's Articles of Incorporation or Bylaws must be submitted "to the BOT for approval prior to becoming effective;" and "that an annual budget, which has been approved by its governing board and recommended by the President, is submitted to the BOT for review and approval." (Id. at 1.) Regulation 1502 also sets the requirements for the DSO's proposed budget, and establishes a procedure for auditing the DSO. (Id.) Moreover, FIU BOT "shall approve all appointments to the governing body of each DSO, other than the BOT Chair's representative(s) or the President or President's designee." (Id. at 2.) Additionally, Regulation 1502 requires FIU BOT approval before the Foundation may purchase real estate in the amount of $10,000,000 or greater during a fiscal year. (Id. at 4.)

Furthermore, the Foundation's Bylaws provide that "[t]he Chairperson of the University Board of Trustees may appoint a representative to the Board and the Executive Committee as an Ex Officio Member." (D.E. 37-1 at 2.) The Bylaws further provide that the Foundation's annual budget must be "approved by the Directors and recommended by the University President to the Board of Trustees . . . . The Board of Trustees must approve the Foundation budget before it can be enacted." (Id. at 9.) The Bylaws also require that the Foundation's annual audit be submitted to FIU BOT for review. (Id.) "The audit shall be conducted in accordance with rules promulgated by the Board of Trustees and with the policies adopted by the Auditor General." (Id. at 10.) Significantly, the Bylaws provide that FIU BOT may dissolve or decertify the Foundation. (Id. at 14.) They also provide that FIU BOT must approve any amendment to the Bylaws. (Id. at 17.) Finally, the Bylaws state: "Notwithstanding anything contained herein to the contrary, the University shall have

15

the right to audit the books, records and operations of the Foundation, as the University determines appropriate in the exercise of its oversight over the Foundation." (Id.)

Additionally, the Florida Board of Governors, which "oversees eleven public universities in the State of Florida, including FIU, and is responsible for operating, regulating, and controlling the management of the State University System[,]" Ruiz v. Robinson, 892 F. Supp. 2d 1321, 1325 (S.D. Fla. 2012) (citing Fla. Stat. § 20.155(4)), exercises further control over the Foundation. For example, the Foundation "may not issue debt without the approval of the Board of Governors. The Board of Governors may approve the issuance of debt by a . . . direct-support organization only when such debt is used to finance or refinance capital outlay projects." Fla. Stat. § 1010.62(3)(a).

Given the substantial control the State maintains over the Foundation through FIU, FIU BOT, and the Florida Board of Governors, this factor suggests that the Foundation is an arm of the state. See Baker, 2016 WL 7385811, at *3 (finding that this factor weighed in favor of finding that DSO was an arm of the state where, inter alia, the president of the university had to review and approve the DSO's articles of incorporation and bylaws (and the amendment and repeal thereof), the university's board of trustees was entitled to inspect the DSO's books, the DSO was required to submit an annual audit to the university president for review and approval, and the DSO's funds were under the university's control); Medtronic PLC, 2016 WL 3869877, at *2 (finding that DSO was controlled by the state where, inter alia, the board of trustees prescribed the rules with which the DSO must comply (including rules for budget and audit review by the board of trustees, and rules regarding university control over the DSO's governing board), and where the DSO's

16

bylaws required approval by the university president); <u>Elend</u>, 2005 WL 8145752, at *3-4 (finding that DSO was controlled by the state where the state had authority over the appointment of the DSO's board members and controlled the board's authority); <u>Plancher</u>, 175 So. 3d at 728-29 (finding that the state controlled the DSO because the university exercised actual control over the DSO's day-to-day operations, controlled the DSO's finances, and had the right to audit the DSO's books).

### 3.    Where the Foundation derives its funds

Plaintiff argues that this factor weighs against a finding that the Foundation is an arm of the state because the Foundation's 2018-2019 Annual Report shows that its funding comes solely from the private sector: "37% from Individuals, 34% from Corporations, 11% from Foundations, 9% from Alumni, and 9% from Organizations."  (Resp. at 7 (citing <u>FIU Foundation, Inc. Annual Report</u>, FIU Foundation, Inc., https://annualreport.fiu.edu/).) These numbers, however, show only monetary <u>contributions</u> to the foundation, which make up only a portion of the Foundation's revenues.  Defendants filed the Foundation's "Financial Statements" for the fiscal year ending June 30, 2019, which shows that the Foundation received about $17,000,000 of its $40,967,246 in operating revenues from investment earnings, rental income, and other operating revenues.  (D.E. 40-4 at 13.)  These funds are generated internally by the state university, (<u>see</u> <u>id.</u> at 13-14), and, therefore, "in a sense" the Foundation is funded by the state.  See <u>Medtronic PLC</u>, 2016 WL 3869877, at *3 (finding, where DSO derived funds from profiting from the commercialization of inventions by university's researchers, that "in a sense [the DSO] is 'funded' by the state, in that it relies on the raw input of patents, etc. from state employees to make money").

And although it appears that a substantial portion of the Foundation's funds are derived from the private sector, the Foundation uses its funds for the advancement of FIU and its objectives—indeed, the majority of the Foundation's operating expenses are for programs, scholarships and building support to FIU, with lesser sums allocated to fundraising, general and administrative expenses, and other support to FIU.  (See id. at 13-14.)  Additionally, the state, through FIU BOT, has ultimate control over the Foundation's fiscal circumstances, as discussed in the previous subsection.  (See supra Section III(a)(2).)  Accordingly, this factor suggests that the Foundation is an arm of the state.  See Baker, 2016 WL 7385811, at *3 (finding that this factor weighed in favor of the DSO where the DSO derived its funds from billing and collecting money, apparently from the private sector, for services rendered by the University's faculty practice where the DSO used the monies it collected for the exclusive benefit of the university, and the university had ultimate control over the DSO's fiscal circumstances); Elend, 2005 WL 8145752, at *4 (finding that this factor weighed in favor of the DSO where DSO's budget and expenditures were subject to monitoring and control by the university, and where the DSO's assets were used to benefit the university); Plancher, 175 So. 3d  at 728-29 (finding that this factor weighed in favor of DSO where university controlled DSO's budget and finances).

### d.    Responsibility for the Foundation's judgments

Pursuant to the Foundation's Bylaws, the Foundation's Board of Directors is responsible for defending and indemnifying

> each of its Directors, officers, employees, volunteers and other agents against
> all liabilities and expenses incurred in the connection with the disposition or
> defense of any action, suit or other proceeding, whether civil or criminal, in

> which such person may be involved by reason of Foundation service, except
> with respect to any matter in which such person shall have been adjudicated
> in any proceeding not to have acted in good faith; and further provided that
> no settlement shall be entered into without the prior consultation and
> approval of a duly authorized representative of the Board.

(D.E. 37-1 at 16.)  Thus, it appears that the Foundation itself is responsible for judgments;

however, it should be noted "that any financial harm to [the Foundation] would harm [FIU],

which is indisputably an arm of the state." Medtronic, 2016 WL 3869877, at *3.

Considering the Foundation's function and the four-factor analysis, the Court finds

that the Foundation is an arm of the state for purposes of this case, and, as such, it is entitled

to Eleventh Amendment immunity. See Baker, 2016 WL 7385811, at *4; Medtronic, 2016

WL 3869877, at *3; Elend, 2005 WL 8145752, at *7; Plancher, 175 So. 3d at 729.

Congress did not abrogate Eleventh Amendment immunity for claims arising under the

FMLA or FLSA pursuant to a valid exercise of authority.  See Coleman, 566 U.S. at 37-

39, 43-44 (holding that Congress did not validly abrogate the States' Eleventh Amendment

immunity from suits for damages under the FMLA's self-care provision); Garrett, 193 F.3d

at 1219 (same), rev'd in part on other grounds, 531 U.S. 356 (2001); Batchelor v. S. Fla.

Water Mgmt. Dist., 242 F. App'x 652, 653 (11th Cir. 2007) (same); Keeler, 397 F. App'x

at 582 (holding that Congress did not validly abrogate the States' Eleventh Amendment

immunity from suits for damages under the FLSA).  Therefore, the Court dismisses Counts

I, III, and V without prejudice for lack of subject matter jurisdiction.  See Stalley ex rel.

United States v. Orlando Reg'l Healthcare Sys., Inc., 524 F.3d 1229, 1232 (11th Cir. 2008)

("A dismissal for lack of subject matter jurisdiction is not a judgment on the merits and is

entered without prejudice.") (citation omitted).

**b.      Counts II, IV, and VI**

Next, Defendants argue that the FMLA and FLSA claims against Martinez (Counts II, IV, and VI) should be dismissed because Martinez in her individual capacity was not Plaintiff's employer.  (Mot. at 13-15.)  Defendants argue that because Martinez is alleged to be an employee of the Foundation, and the Foundation is an arm of the state, Martinez is a public official immune from individual liability.  (Id. at 14 & n.7 (citing Wascura v. Carver, 169 F.3d 683, 688 (11th Cir. 1999) (citing Welch v. Laney, 57 F.3d 1004 (11th Cir. 1995)); Lima v. Fla. Dep't of Children, Case No: 8:13–cv–1809–T–35TBM, 2014 WL 12617915, at *3 (M.D. Fla. Sept. 26, 2014), aff'd 627 F. App'x 782 (11th Cir. 2015)).)

In her Response, Plaintiff argues that Martinez is subject to liability because she was not a state official and she satisfies the FLSA and FMLA's definition of "employer." (Resp. at 8-9.)  Plaintiff further argues that Martinez is not a public official because the Foundation is not an arm of the state (an argument the Court has rejected), and in any event, the Foundation's Bylaws state that "[a]ny person employed by the Foundation shall not be considered to be an employee of the State of Florida by virtue of such employment."  (Id. (quoting Foundation Bylaws, Article 12 (D.E. 37-1 at 17)).)

In their Reply, Defendants argue that "[a]ssuming this Court concludes the Foundation is an arm of the state, then any allegation against Martinez must be dismissed because she would be a state official immune from liability under FMLA and FLSA since the Eleventh Circuit would not deem her as an 'employer.'"  (Reply at 7 (citing Wascura, 169 F.3d at 688; Fonte v. Lee Mem'l Health Sys., Case No.: 2:19-cv-54-FtM-38NPM, 2019 WL 4060163, at *5 (M.D. Fla. Aug. 28, 2019); Welch, 57 F.3d 1004).)

Under the FLSA, "'[e]mployer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency . . . ." 29 U.S.C. § 203(d).  Under the FMLA, the term "employer" includes "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer[.]" 29 U.S.C. § 2611(4)(A)(ii)(I); see also 29 C.F.R. § 825.104(a).  The Eleventh Circuit has observed that the FMLA and FLSA's definitions of "employer" are "materially identical" and "should be given the same meaning[.]"  Wascura, 169 F.3d at 686.

"[T]he law of this circuit [is] that a public official sued in his individual capacity is not an 'employer' subject to individual liability under the FLSA."  Id. (citing Welch, 57 F.3d at 1011).  "Because 'employer' is defined the same way in the FMLA and FLSA," the same rule applies under the FMLA.  Id.

In Welch, the plaintiff, a dispatcher for the Cullman County Sheriff's Department, sued the county sheriff and a deputy sheriff (among others) for, inter alia, violations of the Equal Pay Act.  57 F.3d at 1007.  ("The Equal Pay Act is simply an extension of the FLSA and incorporates the FLSA's definition of 'employer.'"  Wascura, 169 F.3d at 686 (citing Corning Glass Works v. Brennan, 417 U.S. 188, 190 (1974)).)  The district court dismissed with prejudice the Equal Pay Act claims against the defendants in their individual capacities.  Welch, 57 F.3d at 1007.  The plaintiff appealed, and the Eleventh Circuit affirmed the dismissal of the Equal Pay Act claims, finding that the sheriff and deputy sheriff did not qualify as the plaintiff's employer in their individual capacity.  Id. at 1011. With respect to the sheriff in particular, the Eleventh Circuit observed: "Sheriff Laney in

21

his individual capacity had no control over Welch's employment and does not qualify as Welch's employer under the Act." Id.

In Wascura, the plaintiff, a city clerk for the City of South Miami, sued her supervisors (the Mayor, Vice Mayor, and two former City Commissioners) in their individual capacities for violations of the FMLA. 169 F.3d at 684. The defendants moved to dismiss under Rule 12(b)(6), arguing that they were not "employers" within the meaning of the FMLA and therefore could not be held individually liable under the FMLA or, alternatively, that they were entitled to qualified immunity. Id. The district court denied the motion to dismiss, and the defendants prosecuted an interlocutory appeal. Id. As an initial matter, the Eleventh Circuit found that "where a defendant in an FMLA suit does not meet the statutory definition of 'employer,' there is no federal subject matter jurisdiction over the claim against that defendant." Id. at 685 (citation omitted). The Court then cited Welch for the legal principle that "a public official sued in his individual capacity is not an 'employer' subject to individual liability under the FLSA. Because 'employer' is defined the same way in the FMLA and FLSA, Welch controls this case." Id. The Court held that "a public official sued in his or her individual capacity is not an 'employer' under the FMLA, and therefore there is no federal subject matter jurisdiction over such a claim." Id. at 687. As such, the Eleventh Circuit concluded that "[t]he district court should have dismissed the FMLA claim insofar as it is asserted against the defendants in their individual capacities." Id.

Here, Plaintiff has sued Martinez in her individual capacity. (See Resp. at 8 ("Martinez is Subject to Individual Liability under the FLSA and FMLA").) The question

becomes whether Martinez is a public official.  In this regard, the Third Amended Complaint alleges that "Martinez is the Director of Foundation Board Relations at the Foundation . . . ."  (D.E. 34 ¶ 9.)

Defendants assert that Martinez was a "state official" by virtue of being an employee of an arm of the state, (Mot. at 14), while Plaintiff disagrees, (Resp. at 8).  Defendants cite Fonte in support of their argument, while Plaintiff cites no authority supporting her argument.

In Fonte, the plaintiff sued the Lee Memorial Health System and its chief medical officer, Dr. Prasad, in his individual capacity, for violations of the FMLA after Dr. Prasad fired the plaintiff four days after she returned from FMLA leave.  2019 WL 4060163, at *1.  The court found that Lee Memorial Health System was not an arm of the state and not entitled to Eleventh Amendment immunity.  Id. at *5.  However, because the plaintiff did not challenge Dr. Prasad's status as a public official, the Court found that Wascura controlled and that Dr. Prasad could not be held individually liable as the plaintiff's employer under the FMLA.  Id. at *5.  Thus, Fonte does not help answer the question of whether Martinez is a public official.

This case is factually similar to Spurrier v. Board of Trustees of the University of Alabama, Case No.: 2:16-cv-00151-RDP, 2016 WL 4137971 (N.D. Ala. Aug. 4, 2016).  In that case, the plaintiff was a clinical research coordinator employed by the University of Alabama.  See Spurrier, Case No. 2:16-cv-00151, Complaint, D.E. 1 ¶ 9 (N.D. Ala. Jan. 27, 2016).  The plaintiff's supervisor, Donna Kerns, was a Nurse Research Manager for the University.  Id. ¶ 11.  The plaintiff requested and received FMLA leave to undergo

shoulder surgery.  2016 WL 4137971, at * 2.  When she returned to work, she was given an unreasonable work load and harassed by Kerns.  Id.  After the plaintiff complained to human resources, she was terminated.  Id. at *3.  The plaintiff sued, among others, the University's Board of Trustees and Kerns in her individual capacity under the FMLA.  Id.  The Board of Trustees moved to dismiss on Eleventh Amendment immunity grounds.  Id. at *4.  The district court found that the Board of Trustees was an arm of the state and protected by Eleventh Amendment immunity.  Id.  Kerns moved to dismiss on the ground that she did not meet the FMLA's definition of "employer."  Id.  The plaintiff argued that Wascura did not control because Kerns did not qualify as a "public official" under Alabama law.  Id. at *5. The court rejected the plaintiff's argument, found Wascura was binding, and dismissed the FMLA claim against Kerns in her individual capacity, finding that Kerns was a public official and could not be sued in her individual capacity under the FMLA.  Id. at *5-6.  Thus, Spurrier supports Defendants' argument that Martinez was a public official by virtue of being employed by an arm of the state.

Based on the foregoing, and given that Plaintiff has cited no authority to support her position, the Court finds that Martinez is a public official not subject to liability in her individual capacity for violations of the FMLA and FLSA.  Wascura, 169 F.3d at 687; Welch, 57 F.3d at 1011; Fonte, 2019 WL 4060163, at *5; Spurrier, 2016 WL 4137971, at *6; see also Lima, 2014 WL 12617915, at *3 (finding that Secretary of the Florida Department of Children and Families, in his individual capacity, was not the plaintiff's employer for purposes of her Equal Pay Act claim).  Accordingly, the Court lacks

jurisdiction over those claims, <u>Wascura</u>, 169 F.3d at 685, and Counts II, IV, and VI must be dismissed without prejudice, <u>Stalley</u>, 524 F.3d at 1232.

### c.   Counts VII and VIII

Counts VII and VIII allege claims of disability discrimination under the ADA, 42 U.S.C. § 12112, against the Foundation and FIU, respectively.  (Third Am. Compl. ¶¶ 50-51, 107-18.)

Defendants argue that Counts VII and VIII should be dismissed for failure to allege a prima facie case of discrimination under the ADA, (Mot. at 15); Plaintiff's claims for monetary damages under the ADA are barred by the Eleventh Amendment, (<u>id.</u> at 17-18); and Plaintiff failed to state a cause of action against FIU, (<u>Id.</u> at 18-19).

Because the Court finds that (1) FIU is an improper Defendant, (2) the Foundation is entitled to Eleventh Amendment immunity against claims for monetary damages under the ADA, and (3) Plaintiff seeks <u>only</u> monetary damages against the Foundation vis à vis her ADA claim, the Court will limit its discussion to those issues.

### 1.   FIU is an improper Defendant (Count VIII)

Defendants argue that FIU is an improper Defendant because the Florida International University Board of Trustees is the only party amenable to suit under Section 1001.72(1), Florida Statutes.  (<u>Id.</u> at 19.)  Plaintiff does not respond to this argument.

The Court agrees that FIU is not a proper Defendant.  Section 1001.72(1), Florida Statutes, provides, in relevant part:

> Each board of trustees shall be a public body corporate by the name of "The (name of university) Board of Trustees," with all the powers of a body corporate, including the power to adopt a corporate seal, to contract and be

contracted with, to sue and be sued, to plead and be impleaded in all courts
of law or equity, and to give and receive donations.

Pursuant to this statute, in Florida, a public university's board of trustees is the proper entity
to be named in lawsuits against the university.  See Paylan, 2017 WL 2294084, at *2
("UFBOT is the proper entity to be sued in cases against the University of Florida."), report
and recommendation adopted, 2017 WL 2294083 (N.D. Fla. May 25, 2017); Hui Li v.
Univ. of Fla. Bd. of Trs., No. 1:14–cv–236–RS–GRJ, 2015 WL 1781578, at *2 (N.D. Fla.
Apr 20, 2015) ("The program is governed by Defendant University of Florida Board of
Trustees, which is the only University of Florida entity with the capacity to be sued.");
Hankins v. Dean of Commcn's, Valencia Coll., No. 6:12–cv–997–Orl–28KRS, 2012 WL
7050630, at *2 (Dec. 21, 2012) ("[T]he ADA claim is due to be dismissed without prejudice
to filing an amended complaint against The Valencia College Board of Trustees."), report
and recommendation adopted, 2013 WL 521676 (M.D. Fla. Feb. 11, 2013); EEOC v. Fla.
Gulf Coast Univ., Nos. 2:06-cv-326-FtM-29SPC, 2:06-cv-395-FtM-29DNF, 2007 WL
2077577, at *2 (M.D. Fla. July 16, 2007) ("The Court concludes that The Gulf Coast
University Board of Trustees is the proper party, and that The Gulf Coast University should
be dismissed.").

Because FIU is not a proper defendant to this action, Count VIII is dismissed
without prejudice.  See Hankins, 2012 WL 7050630, at *2, Fla. Gulf Coast Univ., 2007
WL 2077577, at *2.

### 2. Eleventh Amendment immunity against monetary damages (Count VII)

Finally, Defendants argue that Plaintiff's claim for monetary damages against the Foundation under Title I of the ADA is barred by the Eleventh Amendment.  (Mot. at 17 (citing Bd. of Trs. of the Univ. Ala. v. Garrett, 531 U.S. 356, 360 (2001)).)  Defendants assert that a "private individual can still seek federal recourse against discrimination in actions for injunctive relief under Ex parte Young, 209 U.S. 123 (1908)."  (Id. at 18 (citing Garrett, 531 U.S. at 374 n.9).  Plaintiff did not respond to this argument.

In Garrett, the U.S. Supreme Court held that suits in federal court by state employees to recover money damages by reason of the state's failure to comply with the ADA are barred by the Eleventh Amendment.  531 U.S. at 360.  However, the Court noted that private individuals can still enforce ADA standards against States "in actions for injunctive relief under Ex parte Young, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908)."  Id. at 360 n.9.

Count VII is a claim by a state employee against an arm of the state alleging failure to comply with the ADA.  (See D.E. 34 ¶¶ 107-12.)  Count VII alleges that "Plaintiff has been damaged [as a result of the ADA violations] and should be compensated for her loss." (Id. ¶ 118.)  The Court construes this as a request for monetary damages under the ADA. Pursuant to Garrett, the Eleventh Amendment bars this claim, and, as such, the Court lacks jurisdiction to consider it.  531 U.S. at 360.

Although a private individual may sue a State for injunctive relief under the ADA, Garrett, 536 U.S. at 360 n.9, the Third Amended Complaint does not seek injunctive relief under the ADA.  The Third Amended Complaint's general prayer for relief includes a request for a declaration "that the acts and practices of Defendants complained of herein

were in violation of the . . . ADA." (D.E. 34 at 15.)  It also seeks declaratory and injunctive relief under the FMLA and FLSA, monetary damages under the FLSA, liquidated damages, attorneys' fees under the FLSA, and "legal and equitable relief[.]"[4]  (Id. at 15-16.)  Because Count VII does not seek injunctive relief against the Foundation, Count VII is dismissed without prejudice.  See Jarrett v. Alexander, 235 F. Supp. 2d 1208, 1215 (M.D. Ala. 2002) (dismissing without prejudice FLSA claims against the State of Alabama on the grounds that the State had not waived its Eleventh Amendment immunity to suits for damages under the FLSA).

## IV.    Conclusion

Accordingly, it is **ORDERED AND ADJUDGED** that:

1.    Defendants' Motion to Dismiss (D.E. 36) is **GRANTED**;

2.    Counts I through VII are **DISMISSED WITHOUT PREJUDICE** for lack of subject matter jurisdiction;

3.    Count VIII is **DISMISSED WITHOUT PREJUDICE** for naming an improper defendant;

4.    All pending motions are **DENIED AS MOOT**; and

---

[4]    Specifically, Plaintiff requests "legal and equitable relief including, but not limited to, reinstatement, enjoining Defendant from further retaliation, payment of lost and withheld compensation, back-pay, front pay, compensatory damages, and additional amounts such as liquidated damages, interest, and reasonable attorneys' fees, and granting such other and further relief as the Court deems just and proper." (Third Am. Compl. at 16 (emphasis added).)  The Third Amended Complaint does not allege ADA retaliation under 42 U.S.C. § 12203(1); it only alleges disability discrimination under 42 U.S.C. § 12112.  (See id. ¶ 110.)  Thus, the Court does not interpret the request for an injunction "from further retaliation" to apply to the ADA claim in Count VII.

5.      This case is now **CLOSED.**

**DONE AND ORDERED** in Chambers at Miami, Florida this 3rd day of March, 2020.


**JOAN A. LENARD**
**UNITED STATES DISTRICT JUDGE**